UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                          Bankruptcy No. 05-31156
                                                                Chapter 7
Gordon Hans Braathen,

              Debtor.
_____/

First State Bank of Munich,

              Plaintiff,

         vs.                                                  Adversary No. 05-7037

Gordon Hans Braathen,

              Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed August 22, 2005, Plaintiff First State Bank of Munich initiated this adversary proceeding seeking determinations that Debtor/Defendant Gordon Hans Braathen is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4) and (5) and that an outstanding debt owed by the Debtor to the Bank in the amount of $14,707 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2). By Answer filed September 1, 2005, the Debtor denies the allegations.

The matter was tried on December 1, 2005. The following constitutes the Court's findings of fact and conclusions of law.

I.  FINDINGS OF FACT

The Debtor is a farmer and a truck driver. The Bank made several operating and equipment loans to the Debtor over the years, and as of June 6, 2005, the Debtor owed the Bank $133,356.36. The property securing the debt included a vehicle, a tractor, a semi trailer, all equipment, all

government payments, all accounts receivable, and all other property listed on the Bank's security agreement.

Brian Anderson, a Bank loan officer, testified that the Bank became aware in the fall of 2004 that the Debtor would not be able to repay his 2004 operating loan. The Debtor's crop yields were down because of a bad soybean crop. Anderson met with the Debtor in the fall of 2004 to discuss the shortage, and the plan was for the Debtor to sell his grain inventory and to put any crop insurance proceeds or government program payments toward the loan balance.

Anderson met with the Debtor again in the spring of 2005. Realizing the Debtor could not repay the 2004 operating loan, the Bank decided not to renew the Debtor's operating loan for 2005. After applying the grain proceeds to the debt, there remained a $20,000-30,000 shortfall. The Debtor testified he turned over all his equipment to the Bank, and decided to quit farming. He asked the Bank to write off the rest of his debt, but the Bank refused.

*A.     The Disaster Payment*

The Debtor received a crop disaster program payment from the Department of Agriculture on May 16, 2005, in the amount of $10,707. The Debtor had already decided to file for bankruptcy at this time and had discussed exemptions with his attorney when he received the payment. He testified he knew he would lose the money to creditors if he did not do something with it, so he used the money from the disaster payment to catch up on his mortgage payments because he had fallen behind. He also knew he had an outstanding obligation to the Bank and that the Bank would suffer financial harm if he did not turn over the check. The Bank's name was not on the check, though, and the Debtor denied knowing the Bank had a lien against the disaster payment. The Bank told him it wanted the money, but did not tell him they had a lien on the disaster payment. According to the

2

Debtor, when hard times hit, he needed the money for his expenses and decided not to give it to the Bank. According to Anderson, he specifically told the Debtor that the Bank's security agreement included the disaster payment and that the Debtor needed to give the Bank the payment to reduce his indebtedness.

The Debtor received disaster payments just twice in his 20 years of farming. The last time he received a disaster payment, he deposited the payment into his checking account and wrote a check to the Bank because it was "the thing to do" even though no one from the Bank told him he had to turn the money over. The difference, according to the Debtor, was that last time he did not need the money and this time he did.

Anderson explained that the Bank has a form that typically is sent to the Farm Service Agency informing it to send any disaster payment check directly to the Bank and not a borrower. This procedure was not followed by the Bank in the Debtor's case in 2004 because although the Bank had a form filled out and in the Debtor's file, it was not signed by the Debtor.

B.   *The Debtor's Tools*

Anderson testified that in determining whether to renew an operating loan each year, he and a borrower meet each spring to update the borrower's balance sheet schedules and to assess the operation's cash flow projections. The Bank's software saves the information from each prior year, and a loan officer and the borrower amend the schedule as appropriate to reflect changes in the property listed and its market value. The particular balance sheet schedule at issue in this case is Schedule 23 which lists the Debtor's machinery, equipment and vehicles. Every year Schedule 23 listed the Debtor's tools with a market value of $4,000.

3

Although the Debtor farmed for 20 years, he owned few tools because his father farmed for 40 years and had most of the tools the Debtor needed. The Debtor conceded at trial that he did not have the $4,000 worth of tools that were listed on his balance sheet, but he contended he never told the loan officer he had $4,000 worth of tools. He testified, "The Bank said I had $4,000 of tools. I never said that." The Debtor characterized the $4,000 figure as the banker's "magic figure," and said that he simply did not disagree with the figure. He said he left the valuation of the tools to the loan officer because he is not an appraiser, and the Bank never asked to see his tools nor asked about the specific types of tools he owned.

Anderson visited the Debtor's farm and saw the Debtor's shop that contained the tools. Anderson testified he thought $4,000 was a fair representation of the value of the tools and that the Debtor never told him the tools in the shop were his father's. He conceded, however, that he was aware the shop was also used by the Debtor's father and that the property in the shop was a mixture of the Debtor's and his father's. Anderson never itemized the Debtor's tools.

The Debtor's 2004 operating loan request was considered and approved by the Bank's loan committee. The president of the Bank, John Vollmer, testified that the lending committee looked very closely at the Debtor's loan application in 2004. The Debtor was short on collateral and at the edge of his credit limit. According to Vollmer, the lending committee may not have approved the Debtor's 2004 operating loan if they had known the truth about the tools because of the importance of the character of a borrower and the Bank's trust in borrowers.

In liquidating the Debtor's property covered by its security agreement, the Bank abandoned any property at the farm worth less than $500 including the tools, press drills, a cultivator, and a harrow. Each of these items was listed on the Debtor's Schedule 23 as worth more than $500.

4

The Debtor filed a voluntary Chapter 7 petition for bankruptcy relief on June 6, 2005. The Debtor did not list any tools in his bankruptcy petition. At the meeting of creditors in connection with his bankruptcy case, the Debtor testified he had $150 worth of tools. He stated at trial that $150 was the amount the Bank's auctioneer told him they were worth.

C.     *The Truck Rims*

The Bank collateralized a loan with a truck. At some date unspecified in the record, the Debtor turned the truck over to the Bank, but he removed aluminum rims from the truck "quite a while earlier." The Debtor testified he did not know the rims were covered by the security agreement. He took the rims off because he needed money, and he viewed the rims as his property.

When the Debtor returned the truck to the Bank without the rims, Anderson explained to the Debtor that the rims were covered by the security agreement and told him the Bank needed the rims back. The Debtor returned some of the rims, but not all of them.

## II. CONCLUSIONS OF LAW

The Bank argues both for the denial of a bankruptcy discharge to the Debtor and for a determination of nondischargeability of the $14,707 owed to the Bank by the Debtor. The Debtor's alleged conduct on which the Bank bases its claims includes: failure to turn over the disaster payment to the Bank, failure to list $4,000 worth of tools in his petition or to satisfactorily explain their absence, and failure to return all of the truck rims to the Bank.

A.     *11 U.S.C. § 727(a)*

The Bank seeks to have the Debtor denied a discharge under 11 U.S.C. § 727(a)(2), (3), (4) and (5). Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

5

\* \* \*

  (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

   (A) property of the debtor, within one year before the date of the filing of the petition; or

   (B) property of the estate, after the date of the filing of the petition;

  (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

  (4) the debtor knowingly and fraudulently, in or in connection with the case—

   (A) made a false oath or account;

   (B) presented or used a false claim;

   (C) gave, offered, received or attempted to obtain money, property, or advantage, or a promise of money, property or advantage, for acting or forbearing to act; or

   (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

  (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a drastic remedy. Kaler v. Geller (In re Geller), 314 B.R. 800, 806 (Bankr. D.N.D. 2004). In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against

6

the objecting party with the burden of proof resting squarely upon the latter. Id. The standard of proof is a preponderance of the evidence. Id.

    1.    Section 727(a)(2)

The Debtor's alleged actions that may support a section 727(a)(2) claim are his failure to turn over the disaster payment and the truck rims to the Bank, both of which occurred prepetition. Section 727(a)(2)(A) applies to prepetition conduct. The elements essential to barring a discharge under section 727(a)(2)(A) are:

> (1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996).

The Bank presented no evidence as to when any act of the Debtor occurred with regard to the truck rims. The Bank therefore has not met the first element of section 727(a)(2)(A) with regard to the removal of the truck rims.

Next, the Debtor received the disaster payment on May 16, 2005. After that date, he transferred the money to be applied toward his mortgage. Because his bankruptcy petition was filed on June 6, 2005, his act of transferring the money was within one year prior to the date of the petition. Having established the first three elements under section 727(a)(2)(A), the critical inquiry, then, is whether he made the transfer with the intent to hinder, delay or defraud the Bank.

Intent to defraud can be established by circumstantial evidence or from inferences drawn from a debtor's course of conduct. MWI Veterinary Supply Co. v. Rodgers (In re Rodgers), 315 B.R 522, 531 (Bankr. D.N.D. 2004). Courts have considered several factors in determining whether a debtor acted with intent to hinder, delay or defraud: (1) lack or inadequacy of consideration; (2)

7

family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry. Id.

In this case, the Debtor put the money from the disaster payment toward his mortgage. He testified he knew he would lose the money to creditors if he did not do something with it, but he thought the money was his. The Bank did not offer any evidence as to the existence of any of the factors listed above or as to any other circumstantial evidence to support its claim. For these reasons, section 727(a)(2) cannot serve as a basis for denial of discharge in the case.

2.      Section 727(a)(3)

A debtor may be denied a discharge pursuant to section 727(a)(3) for failure to keep or preserve records from which his financial situation may be ascertained unless the failure is justified under all the circumstances of the case. Riley v. Riley (In re Riley), 305 B.R. 873, 882 (W.D. Mo. 2004). Intent is not an element of this ground for denial of discharge; the standard imposed is one of reasonableness. Id. Discharge should not be denied if the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition. Id. Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of them. Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005). The complaining

8

party must make an initial showing that the debtor failed to maintain and preserve adequate records and that the failure makes it impossible to ascertain the debtor's financial condition and material business transactions. Id. If the debtor breaches his duty to his creditors to keep adequate records, he is given the opportunity to provide some justification for the breach. Id. If the debtor cannot justify his failure to keep adequate records, his discharge will be denied. Id.

The Bank did not identify any deficiencies in the Debtor's records and therefore has not met its burden of establishing that the Debtor's records were inadequate. Under the circumstances of the case and the limited record in this regard, the Court concludes the Debtor's records were reasonable, and section 727(a)(3) cannot serve as a basis for the denial of discharge in this case.

3.     Section 727(a)(4)

The Bank's contention with regard to this potential ground for denial of discharge is that the Debtor failed to list any tools in his Schedules of Assets and Liabilities when he filed his bankruptcy petition.

A debtor may be denied a discharge pursuant to section 727(a)(4)(A) if the debtor knowingly and fraudulently, in or in connection with a case, made a false oath or account. In order to deny a discharge to a debtor under this subparagraph, a plaintiff must establish that: (1) the debtor knowingly and fraudulently; (2) in or in connection with the case; (3) made a false oath or account; (4) regarding a material matter. Korte v. United States of America Internal Revenue Service (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001). A debtor's signatures on the petition, made under penalty of perjury, are declarations which have the force and effect of oaths of the kind encompassed by the discharge exception for making a false oath. Jordan v. Bren (In re Bren), 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004) (overruled on other grounds). The proper functioning of the entire

bankruptcy process is dependent upon debtors providing complete, accurate and reliable information in the petition and other documents submitted with the filing of the case so that parties in interest may evaluate debtors' assets and liabilities and appropriately administer the case. Id.

At issue here is whether the Debtor "knowingly and fraudulently" made a false oath. Because an admission or other direct evidence of fraudulent intent is rarely available, actual intent may be established by circumstantial evidence. Ellsworth v. Bauder (In re Bauder), 333 B.R. 828, 830 (B.A.P. 8th Cir. 2005). Courts are often understanding of a single omission or error resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive. Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004). The Bank bears the burden of proving fraudulent intent. See In re Bauder, 333 B.R. at 832.

The Debtor admitted at the meeting of creditors that he has $150 worth of tools despite omitting them from his bankruptcy schedules. At trial, however, the Bank did not ask the Debtor why the tools were omitted from his schedules nor did it present circumstantial evidence raising the inference of fraudulent intent. Although the Court is troubled by the Debtor's failure to amend his schedules after the meeting of creditors when his mistake was brought to light, the Bank's burden of proof and evidentiary shortfall lead the Court to conclude that the Debtor's single omission of the tools from his schedules was indeed an honest mistake. For this reason, section 727(a)(4) cannot serve as a basis for the denial of discharge.

4. Section 727(a)(5)

Section 727(a)(5) of the Bankruptcy Code denies a debtor a discharge if he or she has failed to explain satisfactorily any loss or deficiency of assets to meet his or her liabilities. Section 727(a)(5) does not contain an intent element as part of its proof, and what constitutes a "satisfactory" explanation is left to the discretion of the Court. Riley, 305 B.R. at 885. As the party objecting to discharge, the Bank has the burden of proving that a loss of assets actually occurred. Id. Once that burden has been met, it is then incumbent upon the debtor to provide a satisfactory explanation for the loss of the asset. Id.

The Bank did not articulate its asserted basis for this potential ground for denial of discharge, but presumably it is that the Debtor failed to explain the loss of tools that were listed on his balance sheet schedules with the Bank but not on his bankruptcy schedules. The Debtor explained, however, that he never owned $4,000 worth of tools. The tools that were valued at $4,000 included a mixture of tools belonging to both the Debtor and his father. The Bank did not sell the Debtor's tools at auction because the auctioneer deemed them to be worth less than $500. The Court is satisfied with the Debtor's explanation of why he currently has only $150 worth of tools, and the Bank's claim under section 727(a)(5) fails.

B.  *11 U.S.C. § 523(a)*

The Bank asserts that the Debtor's failure to disclose his tools on his petition, which were previously disclosed to the Bank and used to obtain credit was a fraudulent act under section 523(a)(2). The Bank further asserts that the Debtor's failure to turn over the disaster payment, which was pledged for the purpose of obtaining credit, was a fraudulent act under section 523(a)(2).

11

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002). Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993). The standard of proof for exceptions to discharge under section 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991).

Section 523(a)(2) provides an exception to discharge for a debt—

> (2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2). The language "obtained by" clearly indicates that the fraudulent conduct occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the creditor to part with its money, property or services. Valley Memorial Homes v. Hrabik (In re Hrabik), 330 B.R. 765, 772 (Bankr. D.N.D. 2005).

The Bank does not specify which subsection it asserts as a ground for nondischargeability, but subsections 523(a)(2)(A) and (B) are mutually exclusive. Land Investment Club, Inc. v. Lauer (In re Lauer), 371 F.3d 406, 413 (8th Cir. 2004). First, the Debtor's representation to the Bank that he would turn over any disaster payment to the Bank did not concern his financial condition and

12

subsection (A) applies. See Legendary Loan Link, LLP v. Glatt (In re Glatt), 315 B.R. 511 (Bankr. D.N.D. 2004) (analyzing a debtor's alleged misrepresentation to comply with the terms of a lease agreement under section 523(a)(2)(A)).

To establish nondischargeability under section 523(a)(2)(A), the creditor must prove the following: (1) the debtor made a false representation; (2) at the time made, the debtor knew it to be false; (3) the representation was made with the intention and purpose of deceiving the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained the alleged injury as a proximate result of the representation. Clauss v. Church (In re Church), 328 B.R. 544, 547 (B.A.P. 8th Cir. 2005).

The false representation the Debtor made in this case was that he would comply with the terms of the security agreement and turn over to the Bank any disaster payment he received. The Bank falls short, however, in establishing that the Debtor knew at the time the representation was made, i.e., when he executed the security agreement, that he would not comply with its terms. In fact, when he received a previous disaster payment, he gave it to the Bank. This conduct is inconsistent with the Bank's claim, and the Bank did not offer direct or circumstantial evidence to support a finding that the Debtor knew or should have known that he would not comply with the terms of the security agreement. In short, the Bank has failed to carry its burden of proving the Debtor knew the representation that he would comply with the security agreement was false at the time it was made.

The Bank also asserts that the Debtor's failure to disclose his tools on his petition, which were previously disclosed to the Bank and used to obtain credit, was a fraudulent act. First, the appropriate verbiage for the Bank is to assert that the Debtor's alleged misrepresentation as to the

13

value of his tools, which induced the Bank to extend him credit, was fraudulent. Next, this conduct falls within the purview of 523(a)(2)(B) because it related to the financial condition of the Debtor.

To prevail under section 523(a)(2)(B), the Bank has to establish by a preponderance of the evidence that the Debtor obtained money from it (1) by the use of a statement in writing that was materially false; (2) that pertained to his financial condition; (3) on which the Bank reasonably relied; and (4) that the Debtor made with the intent to deceive the Bank. See 11 U.S.C. § 523(a)(2)(B); Jacobus v. Binns (In re Binns), 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005).

The statement at issue here is the Debtor's representation that he owned $4,000 worth of tools. This statement pertained to his financial condition and satisfies the second element of section 523(a)(2)(B). The remaining issues are whether the written statement was materially false, whether the Bank reasonably relied on that statement in lending to the Debtor, and whether the Debtor made the statement with intent to deceive the credit union.

    1.    Material Falsity

The statement must be in writing and materially false. Although the Debtor did not write the $4,000 figure on the balance sheet schedule, he signed the schedule, and written statements need not be physically prepared by a debtor to satisfy the writing requirement of section 523(a)(2)(B). See Fairfax State Sav. Bank v. McCleary (In re McCleary), 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002). The writing requirement is satisfied if the written statement was signed, adopted and used, or caused to be prepared by, the debtor. Id.; Voyatzoglou v. Hambley (In re Hambley), 329 B.R. 382, 399 (Bankr. E.D.N.Y. 2005). The question, therefore, is whether the statements regarding the tools were materially false.

The concept of "materiality" within the context of section 523(a)(2)(B) includes objective and subjective components. Ramsey Nat'l Bank & Trust Co. v. Dammen (In re Dammen), 167 B.R. 545, 550-51 (Bankr. D.N.D. 1994). Objectively, a statement is materially false if it paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type that would normally affect the decision to grant credit. Wallander v. Wallander (In re Wallander), 324 B.R. 746, 752 (Bankr. N.D. Iowa 2005). The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation. In re Dammen, 167 B.R. at 51.

The president of the Bank, John Vollmer, testified that the lending committee *may not have* approved the Debtor's 2004 operating loan if they had known the truth about the tools. In other words, even subjectively the statement was not necessarily material. Moreover, the Court is not convinced that the Bank proved the Debtor's statement was a misrepresentation that painted a substantially untruthful picture. The $4,000 worth of tools was a small part (3%) of the $126,500 worth of property listed on the balance sheet schedule. The Debtor's statement that he had $4,000 worth of tools may have been inflated, but it did not paint a substantially untruthful picture of his financial condition at the time the loans were made.

    2.    Reasonable Reliance

The next issue is whether the Bank reasonably relied on the Debtor's statement that he had $4,000 worth of tools. To establish reasonable reliance, a creditor must prove that reliance was objectively reasonable and that there was actual reliance. In re Bowden, 326 B.R. 62 (Bankr. E.D. Va. 2005). Reasonable reliance is determined considering the totality of the circumstances. First

15

Nat'l Bank of Olathe v. Pontow, 111 F.3d 604, 610 (8th Cir. 1997); Guess v. Keim (In re Keim), 236 B.R. 400, 402 (B.A.P. 8th Cir. 1999).

The parties stipulated that the Bank relied upon the Debtor's representation as to the value of his tools. The question is whether the reliance was objectively reasonable. The Court does not sit as an after-the-fact loan committee that second guesses lending decisions, but the standard of reasonableness places a measure of responsibility on a creditor to ensure that there exists some basis for relying on a debtor's representations. Among other things, a court may consider whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate, and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. Pontow, 111 F.3d at 610. The issue of reasonableness presented under section 523(a)(2)(B) is not whether it was reasonable for the Bank to have loaned the Debtor money, but whether it was reasonable for the Bank to have relied upon his statement that he had $4,000 worth of tools in extending him credit.

The Bank's software saved the Debtor's information from each prior year, and the $4,000 figure carried over each year. The only evidence as to where the $4,000 figure originated was the Debtor's testimony that it was the banker's "magic figure," and that he simply did not disagree with the figure. The Court finds his testimony that he left the valuation of the tools to the loan officer because he is not an appraiser reasonable, particularly when coupled with the fact that Brian Anderson, the loan officer, visited the Debtor's farm and saw the Debtor's shop containing his tools. Anderson knew the shop was also used by the Debtor's father and that the property in the shop was a mixture of the Debtor's and his father's, yet he never itemized the Debtor's tools. Anderson's knowledge of the mixed ownership of the tools was a red flag that would have alerted an ordinarily

prudent lender to conduct at least a minimal investigation into the veracity of the assertion. His failure to do so supports a finding that the Bank's reliance was not reasonable, and it bolsters the Court's finding that the representation was not material.

3.	Intent to Deceive

For discharge to be barred, the debtor must have acted with intent to deceive. A creditor may establish such intent by proving reckless indifference to or reckless disregard for the accuracy of the information in a debtor's financial statement. NAFCO Fed. Credit Union v. Lawson (In re Lawson), 308 B.R. 417, 423 (Bankr. D. Neb. 2004).

The Debtor's admission that he knew he did not have $4,000 worth of tools when he signed the balance sheet schedule evidences a reckless disregard for the accuracy of the information in his financial statement. However, all of the elements must be established to succeed on a claim under section 523(a)(2)(B), and the Bank has not established material falsity or reasonable reliance. The Bank's claim under section 523(a)(2)(B) therefore fails.

Based on the foregoing, the Complaint of Plaintiff First State Bank of Munich based upon sections 523 and 727 of the Bankruptcy Code is DISMISSED.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this February 1, 2006.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**

17